# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>   v.<br><br>QUAN HILARIO CELESTINE,<br><br>               Appellant. | No. 59800-1-II<br><br><br><br>UNPUBLISHED OPINION |

MAXA, J. – Quan Celestine appeals the trial court's order granting the State's motion to dismiss a juror for cause and his convictions for witness tampering – domestic violence and five counts of protection order violation – domestic violence.

Celestine was charged with harassing BM, his intimate partner. The court entered a no-contact order. Celestine then sent several text messages to BM from jail instructing her to tell his attorney that he did not threaten her and that she should not testify against him in court, among other things. The State charged Celestine with witness tampering under RCW 9A.72.120(1) and with five counts of protection order violation.

During voir dire, juror 23, a person of color, said that he was not a big fan of being in court. He shared the negative experiences that he and his family members had with the legal system, including being accused of domestic violence. The State challenged juror 23 for cause

under RCW 4.44.170(2), arguing that he demonstrated actual bias. The trial court granted the State's motion.

GR 37(h)(i)-(iii) states that having prior contact with law enforcement officers, expressing distrust of law enforcement, and having a close relationship to people who have been stopped, arrested, or convicted of a crime all are presumptively invalid reasons for a *peremptory* challenge against a juror. Celestine argues that the presumptively invalid reasons in GR 37(h) should be applied to for cause challenges as well.

Celestine also argues that his witness tampering conviction must be dismissed because RCW 9A.72.120(1) defines an alternative means crime and there was insufficient evidence to prove that Celestine induced BM to absent herself from the proceedings under RCW 9A.72.120(1)(b), and that his violation of protection order convictions must be reversed because the protection order was dismissed before trial.

We hold that (1) although the trial court should be mindful of GR 37(h) when addressing for cause challenges, based on the plain language of the rule, GR 37(h) does not create a presumption that the circumstances listed in the rule are invalid reasons to support a for cause challenge; (2) the trial court did not abuse its discretion when it granted the State's motion to strike juror 23 for cause; (3) regardless of whether RCW 9A.72.120(1) defines an alternative means crime, there was sufficient evidence to prove that Celestine induced BM to absent herself from the proceedings under RCW 9A.72.120(1)(b); (4) Celestine's argument that his protection order violation convictions should be reversed because the protection order no longer was in effect at the time of trial has no merit; (5) there is a scrivener's error in the judgment and sentence regarding the no-contact order that must be corrected; and (6) as the State concedes, community custody supervision fees must be stricken.

Accordingly, we affirm Celestine's convictions, but we remand for the trial court to correct the scrivener's error and to strike the community custody supervision fee in the judgment and sentence.

FACTS

*Background*

In 2020, the State charged Celestine with harassment against BM and another person named Michael. A bench warrant issued for Celestine's arrest based on the harassment charge.

On March 13, 2023, Celestine appeared in court for a warrant hearing. The trial court entered a pretrial no-contact order. The order prevented Celestine from contacting BM by phone, mail, or electronic means, among other things. The no-contact order remained in place through the time of sentencing.

On March 17, Celestine sent the following text message to BM.

> The State of Washington has a restraining order against me to not talk to or have any contact with you or Michael. They do not know we have kids. These people are trying to mess over me. Only you and Michael can stop this by going to the courthouse and forcing them to remove the restraining order. Talk to the Judge; let them know this charge is three years old and we have had two kids since and that you want them to remove the restraining order and drop the charges.

Report of Proceedings (RP) at 337.

On March 27, Celestine sent BM more text messages, including:

> When you talk to that lady, Ms. Townsend [a defense attorney], don't tell her I threatened you. Tell her you never said that; J.B. Hunt did and then it's me against J.B. Hunt.

RP at 339-40. Less than two minutes later, Celestine texted the following:

> [B]ut don't tell her that because she gonna try and make you testify against me in court. Tell her you're not testifying – you or Michael – and that they need to move [sic] the restraining order for both you and Michael and that we all live together.

RP at 340.

In November, the State filed a second amended information charging Celestine with one count witness tampering – domestic violence and five counts of protection order violation – domestic violence. The State stated that it was not proceeding on the harassment charges. Celestine pleaded not guilty.

*Jury Selection*

During jury selection, Celestine engaged in the following colloquy with juror 23:

Celestine: All right. So the question is – single thing or event in your life or lifetime that most shapes the way you view the world, your world, or this case.

Juror: Well, okay, there's some (indiscernible). And I spend most of my days (indiscernible). And but I – *I've been in a courtroom* (indiscernible). (Indiscernible) *I'm not a big fan of it*. And recently – not recently, but a few years back, (indiscernible) he was *hurt really bad by a family member* (indiscernible). (Indiscernible) handle in the correct way, so (indiscernible). *And tried to get custody of my son and didn't* get (indiscernible) did not get involved in the court at all, even though it happened (indiscernible). *So I'm not a big fan of coming to court; not a big fan of thinking that things can go your way* when things go wrong, even though you know that (indiscernible).

RP at 178 (emphasis added).

I recently lost my brother. His baby mom is (indiscernible) because he broke down the door to get his clothes out of there. He was taking his stuff and he was shot and murdered not too long ago – a few months ago. And she thought it was just because they called him an intruder and that was the way it was put on the news, *so I'm not a big fan of being in here*; I'm not a big fan of (indiscernible).

RP at 178-79 (emphasis added).

But I like to think there's still some good things that have come out of the courtroom, just it's hard to think – I don't know. Life's fair sometimes and sometimes things happen to good people and sometimes life doesn't turn out that way.

Celestine: So I think I said it to someone over here – you've had some things happen in your life. Obviously I'm standing in a courtroom and I'm part of the system (indiscernible), so I'm sorry that has transpired that way for you.

How old is your son?

Juror: He's 13 now.

Celestine: If you don't mind me asking – what is the current schedule? How often do you get him?

Juror: It's 50/50, so – but just the way things played out. I wanted full custody of my son, knowing the signs of what could (indiscernible) happen and I told her about it. Nothing happened and what I said was (indiscernible) and she still (indiscernible).

RP at 179. Juror 23 did not say that he could not be an impartial juror. And neither party asked juror 23 if his experience in the court system would affect his ability to be fair.

The State moved to strike juror 23 for cause.

Your Honor, the State would seek to strike juror No. 23. He didn't speak up, so I was not able to follow through directly on the impartiality question; however, he did indicate that *he has essentially no faith in the justice system* and through several parts of the justice system, I believe both criminal and civil family law matters.

RP at 186 (emphasis added).

He also indicated that his brother very recently passed away in what appears to have been a – a DV situation – unclear whether he was purely a perpetrator or a victim or if it's more of a grey area, but I think that this – he indicated – *I would call his tone borderline angry at the entire system.* So I think that that would impact his ability to participate as a juror in these proceedings.

RP at 187 (emphasis added).

Celestine responded:

Well, I would consider that gentleman a person of color, so I would ask the Court to go through that challenge as well.
. . . .

He said he had been accused of domestic violence and it was untrue.[1] He's not a big fan. He hasn't experienced justice in the court system.

---

[1] The quoted passages from juror 23 do not include a reference to Celestine being accused of domestic violence, but there were several places where the transcript states "Indiscernible." Both Celestine and the trial court referenced this fact, so the statement about being accused of domestic violence must have been indiscernible to the transcriptionist.

He lost his brother, who was characterized in the media or by police as an intruder. I think he referred to it as media, but I'm sure that that dovetails with police. So if the Court heard it differently, that's fine.

So I think these are some of the grapes of wrath the State harvests when they cast too broad a net in domestic violence cases and I would ask that he remain both for as a person of color in a case with my client being a person of color. And then I would ask that he remain because he's experienced firsthand some of these injustices and that's just the way it is.

RP at 187-88.

The trial court granted the State's motion to strike juror 23. The court stated,

*[Juror 23] [i]ndicated that he had been falsely accused of domestic violence*; he said it was proven it was false. All right, so there's that sort of feeling.

He said he's not a big fan of coming to court; he said it can go wrong, even if you have all the evidence. *So basically what he appears to be saying here is that even if the evidence is in your favor, you know, you can be found guilty* -- I suppose is basically what he's saying -- or it can go against you.

RP at 189-90 (emphasis added).

So he made a subsequent comment – brother killed by significant other – it was unclear to me if it was a girlfriend or wife – and she got away with it.
. . . .

Okay. And then he made another statement – life isn't fair sometimes; sometimes bad things happen to good people.

All right. So when I -- when I think about this, all these comments made together -- I guess the question I have to face is -- can a challenged person try the issue impartially without substantial prejudice to the substantial rights of the party challenging. So party challenging is the State and the question is -- can this person try the issue impartially and without prejudice to the State.

RP at 191-92.

So taken together -- I mean, *he makes multiple statements saying basically that the court system doesn't get it right.* You know, basically that -- and despite the evidence, that -- that wrong decisions are -- you know, occur. And he cites to multiple experiences where this has happened. So I mean, this is his feeling, it appears to me.

6

It doesn't appear to me that he can impartially try the matter, you know, based on everything he said. *I mean, you know, he's cited to, what, three or four different events where -- and he said something along the lines of he doesn't like coming to court for this reason.* You know, so he *cites to multiple events in court where unjust decisions apparently are made*, at least in his opinion.

RP at 192 (emphasis added).

*Jury Trial*

The court provided the following jury instructions:

A person commits the crime of tampering with a witness when he or she attempts to induce a witness or person he or she has reason to believe is about to be called as a witness in any official proceeding or a person whom he or she has reason to believe may have information relevant to a criminal investigation to testify falsely and/or to withhold any testimony and/or to absent himself or herself from any official proceedings.

Clerk's Papers (CP) at 40.

To convict the defendant of the crime of tampering with a witness, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about or between March 12, 2023 and April 4, 2023, the defendant attempted to induce a person to testify falsely and/or withhold any testimony and/or absent himself or herself from any official proceeding; and

(2) That the other person was a witness or a person the defendant had reason to believe was about to be called as a witness in any official proceedings; and

(3) That any of these acts occurred in the State of Washington.

CP at 41.

The jury found Celestine guilty of witness tampering and of five counts of protection order violation. The jury also found that Celestine and BM were intimate partners. The trial court orally stated that it was issuing a no-contact order, but stated that Celestine could have written contact with BM for purposes of child raising. However, the judgment and sentence did not incorporate that limited exception to the no-contact order. And the court imposed monthly community custody supervision fees.

Celestine appeals his convictions and sentence.

## ANALYSIS

A.     FOR CAUSE DISMISSAL OF POTENTIAL JUROR

Celestine argues that the trial court erred when it granted the State's motion to strike juror 23 for cause. He claims even though GR 37 expressly applies only to peremptory challenges, we should apply GR 37(h) principles to for cause challenges. We disagree.

1.     Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution both guarantee a defendant the right to a trial by an impartial jury. *State v. Smith*, 3 Wn.3d 718, 720, 555 P.3d 850 (2024). "To safeguard this right, judges must remove jurors for cause when the jurors cannot fairly decide a case, either on a party's motion to strike the juror or on the court's own motion in clear cases of bias." *Id.*

Actual bias is a basis to challenge a juror for cause. RCW 4.44.170(2). Actual bias exists when there is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2).

"We afford great deference to the trial court's assessments concerning bias, and the grant or denial of a challenge for cause will be reversed only for manifest abuse of discretion." *Smith*, 3 Wn.3d at 724. When the trial court bases its decision on untenable grounds or if its decision is manifestly unreasonable, it abuses its discretion. *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 807, 425 P.3d 807 (2018).

We give great deference to the trial court because of its ability " 'to observe the juror's demeanor [during voir dire] and, in light of that observation, to interpret and evaluate the juror's answers to determine whether the juror would be fair and impartial.' " *State v. Lawler*, 194 Wn. App. 275, 282, 374 P.3d 278 (2016) (quoting *State v. Davis*, 175 Wn.2d 287, 312, 290 P.3d 43 (2012)). " '[T]he trial court is in the best position to determine a juror's ability to be fair and impartial.' " *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 856, 456 P.3d 869 (2020) (quoting *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991)).

The court in *Smith* stated,

> What emerges in the fact-specific analysis of our cases is an approach that requires trial judges to carefully assess the juror's statements, and any additional information revealed in juror questionnaires or during voir dire, in order to determine whether the juror is actually biased and therefore unfit to serve. Given the nuanced nature of this exercise, which relies heavily on the trial judge's assessment of the juror's responses, demeanor, and tone in context, appellate review is appropriately restrained. We will not disturb the trial court's decision absent a clear abuse of discretion, i.e., where no reasonable judge would have made the same decision.

3 Wn.3d at 727.

2.   GR 37 and Implicit Racial Bias

GR 37 was designed "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). Under GR 37(c), "[a] party may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(e) states, "If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied."

GR 37(g) provides several circumstances for courts to consider in making its determination of whether a peremptory challenge was made on the basis of improper bias. These "include [assessing] the number of questions asked of a juror, how many times that juror was

9

asked questions, whether the party exercising the peremptory challenge asked more questions of one particular juror, or whether a reason might be disproportionately associated with a race or ethnicity." *State v. Tesfasilasye*, 200 Wn.2d 345, 358, 518 P.3d 193 (2022).

GR 37(h) provides that seven reasons for peremptory challenges that presumptively are invalid, including "(i) having prior contact with a law enforcement officers; (ii) expressing distrust of law enforcement. . . ; [and] (iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime." "These seven presumptively invalid reasons are highly correlated 'with race and have been used historically to exclude people of color from jury service.' These justifications are not accurate indicators of a person's fitness to serve as a juror." *Tesfasilasye*, 200 Wn.2d at 358 (quoting PROPOSED NEW GR 37 – JURY SELECTION WORKGROUP, FINAL REPORT, app. 2 (2018)).

The court in *Tesfasilasye* observed that "[r]acial bias has long infected our jury selection process," and noted that GR 37 was enacted "[a]s part of our efforts to reduce racial bias in the judicial system." 200 Wn.2d at 347.

3.    Analysis

Celestine argues that the trial court erred when it granted the State's motion to strike juror 23 because the court relied on impermissible reasons that could be viewed as racially discriminatory. He emphasizes that for example, a person of color's distrust of the court system and the belief that the system does not treat people fairly is a presumptively invalid reason to strike a juror under GR 37(h)(ii), and also should be an invalid reason for granting a for cause challenge.

GR 37 expressly applies only to peremptory challenges. And the adoption of GR 37 occurred after a lengthy process: "Stakeholders worked on it for several years, receiving

comments and providing recommendations for this court to adopt." *Tesfasilasye*, 200 Wn.2d at 357. We believe that if the Supreme Court had wanted GR 37 to apply to for cause challenges, it would have said so.

In addition, distinguishing between peremptory challenges and for cause challenges is appropriate because there is a fundamental difference between the two. Peremptory challenges are made because the challenging party suspects the potential for prejudice. For cause challenges involve demonstrated actual bias. Moreover, absent GR 37, there is no mechanism for the trial court, as the neutral decisionmaker, to intervene in a peremptory challenge based on perceived bias. In contrast, a for cause dismissal of a juror cannot be made without a neutral judicial decision that for cause dismissal is warranted. Given these fundamental differences, it makes sense for the Supreme Court not to have included for cause challenges in GR 37.

But that does not mean that the presumptively invalid reasons for peremptory challenges listed in GR 37(h) are not something trial court can and should consider when addressing for cause challenges. The Supreme Court has indicated that courts must take steps to eliminate racial bias in jury selection. *Id.* at 347. And as the court noted in *Tesfasilasye*, these presumptively invalid reasons are highly correlated with race. *Id.* at 358. Therefore, trial courts must be mindful of the presumptively invalid reasons in GR 37(h) when considering for cause challenges.

Here, juror 23 had a series of negative experiences with the court system. From juror 23's perspective, his son apparently was hurt by a family member, and the matter did not get handled in the right way. He tried unsuccessfully to get custody of his son. He was falsely accused of domestic violence. His brother was shot and killed in an apparent domestic violence situation and the killer was not charged. As a result, he was not a "big fan" of coming to court or

11

of thinking that things can go his way in court. RP at 178. And juror 23 made other comments that were labeled "unintelligible" in the record. The prosecutor described juror 23's tone as "borderline angry at the entire system." RP at 187.

The trial court first focused on the fact that juror 23 said he had been falsely accused of domestic violence. The court also noted that his brother had been killed by a significant other. In addition, the court summarized juror 23's various comments about not being a fan of coming to court: "he makes multiple statements saying basically that the court system doesn't get it right." RP at 192. And the court noted that juror 23 cited to "multiple events in court where unjust decisions apparently are made." RP at 192.

Juror 23's negative experiences with domestic violence were concerning in that Celestine's case involved allegations of domestic violence. And the fact that he was not a fan of coming to court was not just a generalized feeling – it was based on several specific experiences where he believed the court system had failed. Neither party made any attempt to explore whether juror 23 could be fair despite these experiences.

Celestine argues that the trial court improperly relied on the preemptively improper reasons for peremptory challenges in GR 37(h)(i), (ii), and (iii). But the facts here do not fit squarely into those categories. GR 37(h)(i) refers to "having prior contact with law enforcement officers." Celestine suggests that because juror 23 had been accused of domestic violence, he must have encountered a law enforcement officer. But there was no direct evidence of that, nor were the juror's comments specifically about his own contact with law enforcement. And the trial court did not rely on the fact that juror had prior contact with law enforcement officers.

GR 37(h)(ii) refers to "expressing a distrust of law enforcement." Celestine argues that the term "law enforcement" necessarily includes the court system. But GR 37(h)(ii) did not use

the term "court system," and for good reason. If selected, jurors become an essential part of the court system and they are entrusted to comply with their oath and the instructions the court provides to them. A prospective juror's sentiment about the court system and their willingness and ability to faithfully play the role of juror is fundamentally different from a distrust of law enforcement officers. Moreover, there was no indication that juror 23 distrusted law enforcement *officers*, the term used in GR 37(h)(i).

GR 37(h)(iii) refers to "having a close relationship with people who have been stopped, arrested, or convicted of a crime." There was no evidence that juror 23 had a close relationship with people involved in the criminal justice system. And the trial court did not rely on that fact.

Apart from GR 37(h), Celestine argues that there was no evidence of actual bias because juror 23 did not state that he could not be fair. But there is no authority for the proposition that a juror's express statement that they could not be fair is a requirement for finding actual bias.

Our standard of review is abuse of discretion. *Smith*, 3 Wn.3d at 724. And as noted above, we give great deference to the trial court, who was in the courtroom and is in the best position to evaluate a juror's responses. *Lawler*, 194 Wn. App. at 282. We see no basis for second-guessing the trial court's decision here.

We hold that the trial court did not abuse its discretion when it granted the State's motion to dismiss juror 23 for cause.

B.    WITNESS TAMPERING AND ALTERNATIVE MEANS

Celestine argues that RCW 9A.72.120(1)(a) and (b) lists alternative means of committing witness tampering, and the State failed to produce sufficient evidence to prove the means in (1)(b). We conclude that even if witness tampering is an alternative means crime, the State presented sufficient evidence to prove both means.

1.  Legal Principles

Whether a crime involves alternative means relates to jury unanimity, which is required under article I, section 21 of the Washington Constitution. *State v. Roy,* 12 Wn. App. 2d 968, 973, 466 P.3d 1142 (2020). If charged with an alternative means crime, a defendant is entitled to a unanimous jury determination for the specific means by which they committed the crime. *Id.* The State must offer sufficient evidence to support each of the alternative means unless there is an express statement of jury unanimity. *Id.* But if the statute identifies only a single means of committing a crime, jury unanimity is not required even if there is more than one way of establishing that means. *Id.*

The test for sufficiency of the evidence is whether any rational trier of fact could have found guilt beyond a reasonable doubt after viewing the evidence in the light most favorable to the State. *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024). The remedy for insufficient evidence is dismissal of the conviction. *State v. Brown*, 147 Wn.2d 330, 336, 58 P.3d 889 (2002).

2.  Analysis

RCW 9A.72.120(1) states that a person is guilty of witness tampering if they attempt to induce a witness in an official proceeding to "(a) [t]estify falsely or, without right or privilege to do so, to withhold any testimony" or "(b) [a]bsent himself or herself from such proceedings" or "(c) [w]ithhold from a law enforcement agency information which he or she has relevant to a criminal investigation or the abuse or neglect of a minor child to the agency." The jury instruction provided in this case included only RCW 9A.72.120(1)(a) and (b). We need not decide whether RCW 9A.72.120(1)(a) and (b) define alternative means of committing witness

14

tampering if the State presented sufficient evidence to support both (1)(a) and (1)(b). *See Roy,*

12 Wn. App. 2d at 973.

Celestine concedes that sufficient evidence established that he told BM to testify falsely

or to withhold testimony under RCW 9A.72.120(1)(a), but he argues that sufficient evidence did

not support that he induced BM to absent herself from court under RCW 9A.72.120(1)(b).

The evidence the State presented to show that Celestine attempted to induce BM to

absent herself from the proceedings were Celestine's text messages.

> The State of Washington has a restraining order against me to not talk to or have
> any contact with you or Michael. They do not know we have kids. These people
> are trying to mess over me. Only you and Michael can stop this by going to the
> courthouse and forcing them to remove the restraining order. *Talk to the Judge*; let
> them know this charge is three years old and we have had two kids since and that
> you want them to remove the restraining order and drop the charges.

RP at 337 (emphasis added).

> When you talk to that lady, Ms. Townsend [a defense attorney], don't tell her I
> threatened you. Tell her you never said that; J.B. Hunt did and then it's me against
> J.B. Hunt.

RP at 339-40.

> [B]ut don't tell her that because she gonna try and make you testify against me in
> court. *Tell her you're not testifying* – you or Michael – and that they need to move
> [sic] the restraining order for both you and Michael and that we all live together.

RP at 340 (emphasis added).

We conclude that the third text message provides sufficient evidence that Celestine

attempted to induce BM to absent herself from the proceedings. When Celestine says "tell her

you're not testifying," it is unclear whether "her" refers to the defense attorney or the prosecutor

– both were women. Either way Celestine is telling BM that she should say that she will not

testify against him. Viewing the evidence in the light most favorable to the State, Celestine

telling BM not to testify against him is functionally the same as telling her not to come to court

because she arguably would not have any other reason to engage with the proceedings if not to testify at least in part against him. And it does not make sense to conclude that Celestine would tell BM to inform the attorneys that she will not testify, but she would still would show up in court.

Accordingly, viewing the evidence in the light most favorable to the State, we hold that there was sufficient evidence to convict Celestine of witness tampering under both RCW 9A.72.120(1)(a) and (b).

C.     PROTECTION ORDER VIOLATION CONVICTIONS

Celestine argues that his protection order violation convictions must be dismissed because the harassment charge that was the basis for the no-contact order was dismissed before trial. We disagree.

Celestine relies on *City of Tacoma v. Cornell*, 116 Wn. App. 165, 64 P.3d 674 (2003) and *State v. Anaya*, 95 Wn. App. 751, 976 P.2d 1251 (1999). But neither case applies to the facts here.

In *Cornell*, a superior court commissioner entered a restraining order against the defendant, who sought revision of the order by a superior court judge. 116 Wn. App. at 167. The superior court ruled that the evidence did not support issuance of the restraining order and vacated the order. *Id.* After the superior court vacated the order, the State charged the defendant with violating the order during the time the order was in effect. *Id.*

The Court of Appeals held that charge must be dismissed. *Id.* at 171. The court noted that the State had charged the defendant with violating an order that had been declared invalid. *Id.* at 170. The court concluded,

> The City may charge a person for violating an order during the time the order is valid and in effect. But the City may not charge a person for violating an order

16

after the order has been vacated, even if the alleged violation occurred while the order was in effect. In other words, the City might have prevailed had it charged Cornell for violating the order before it was vacated.

*Id.* at 170-71.

Here, the protection order was never declared to be invalid; it remained in effect through trial. In addition, the State charged Celestine while the protection order still was in effect. *Cornell* does not support Celestine's argument.

In *Anaya*, the district court entered a no-contact order at the arraignment for an assault charge. 95 Wn. App. at 753. Two months later, the assault charge was dismissed but the no-contact order was not rescinded. *Id.* Several months after the assault charge was dismissed, the defendant violated the no-contact order and the State charged the defendant with that violation. *Id.* at 753-54. The defendant was convicted of violating the no-contact order. *Id.* at 754. The Court of Appeals held that the no-contact order expired upon the dismissal of the underlying assault charge. *Id.* at 760. Therefore, the court reversed the conviction. *Id.* at 761.

Here, Celestine violated the protection order before the underlying harassment charge was dismissed. Therefore, the protection order still was valid at the time of the violation. *Anaya* does not support Celestine's argument.

We affirm Celestine's protection order violation convictions.

D.    OMISSION IN JUDGMENT AND SENTENCE

Celestine argues that there is a scrivener's error in the judgment and sentence regarding his no-contact order regarding BM that must be corrected. We agree.

In its oral ruling, the trial court stated that it would issue a no-contact order preventing Celestine from having contact with BM. But the court stated that some limited contact would be allowed:

My approach in these cases is to -- when perpetrator and victim have children in common, I allow them to have written contact for the purposes of child raising. And I appreciate that, you know, defendants commit crimes, but that doesn't, you know, exclude them from being involved in -- in their -- the raising of their children.
. . . .

So I'll allow [Celestine] and [BM] to have written contact. And that would be email, text -- you know, letters -- you know, anything that's actually documented or can be documented so that we have a clear picture of what they actually said.

RP at 496.

However, the judgment and sentence – which included the no-contact provision – did not mention the permitted written contact for the purpose of child raising.

Celestine argues that the omission of the no-contact order exception is a scrivener's error, and that we should remand for the trial court to correct the error. The State argues that any error in the judgment and sentence can only be corrected under CrR 7.8(a).

We agree with Celestine. It is clear that the trial court intended to allow contact between Celestine and BM for the purpose of child raising, but that intent was not reflected in the judgment and sentence. Under the specific facts of this case, it would make no sense to require Celestine to file a CrR 7.8(a) motion to correct this obvious mistake.

We remand for the trial court to correct the scrivener's error in the judgment and sentence.

E.      COMMUNITY CUSTODY SUPERVISION FEES

Celestine argues, and the State concedes, that the provision imposing community supervision fees must be stricken. We agree.

In 2022, the legislature eliminated trial courts' ability to impose supervision fees as a condition of community custody in 2022. LAWS OF 2022, ch. 29, § 7. RCW 9.94A.703, which dictates the conditions of community custody, no longer allows for the imposition of community

custody supervision fees on convicted defendants. Accordingly, we hold that the provision imposing community custody supervision fees must be stricken from the judgment and sentence.

CONCLUSION

We affirm Celestine's convictions, but we remand for the trial court to correct the scrivener's error and to strike the community custody supervision fee in the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

CRUSER, C.J.

GLASGOW, J.